IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MALISSA H. STOVALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 12-00604-CG-N |
| | ) |
| THE COMPASS GROUP/MORRISON MANAGEMENT SPECIALIST, | ) |
| | ) |
| Defendant. | ) |

## ORDER

This matter is before the court on the defendant Compass Group USA, Inc.'s ("Compass Group") motion for summary judgment (Doc. 41), the plaintiff Malissa H. Stovall's ("Stovall") response in opposition to the motion for summary judgment (Doc. 43), and Compass Group's reply thereto (Doc. 45). For the reasons stated below, Compass Group's motion for summary judgment is **GRANTED**.

## FACTUAL BACKGROUND

This is a lawsuit in which the plaintiff alleges that she was discriminated against by her employer on account of her race and her religion, and that she also was subject to retaliation for statutorily protected activity.

On November 3, 2008, Stovall began working as a Credit Specialist in the Cash and Credit Management Department at Compass Group's Mobile Support Center ("MSC") in Mobile, Alabama. (Doc. 41-1 ¶ 4; Doc. 41-2 at 55-56). Compass Group is a food service management and support services company with multiple sectors and lines of business, including the Morrison Management Specialists

("Morrison") division. Morrison provides food, nutrition and dining services exclusively to healthcare organizations and senior living communities throughout the United States. (Doc. 41-1, at 2,3). Stovall's job duties included managing the accounts receivable process for field accounts assigned to her. (Doc. 41-2 Exhibit 7). Stovall's written job description required her to: (1) work with operations to collect opening costs and client deposits; (2) verify accounts receivable from contracts and load it into Compass Group's IT system; (3) monitor the field accounts on a repayment plan; (4) assist in posting account receivable payments; (5) initiate refund requests for credit balances; (6) work with operations regarding uncollectible amounts; (7) assist with billing reconciliations; and (8) assist with write-off reports. (Doc. 41-2 at 60-61, Exhibit 7). Credit Specialists are particularly busy on the first two days of every month when they review outstanding invoices and distribute interest invoices. (Doc. 41-1 ¶ 5). Stovall reported to Jerry Carpenter ("Carpenter") who was the Director of the Cash and Credit Management Department. (Doc. 41-2 at 57-58). Several senior members of the Cash and Credit Management Department trained Stovall on her job duties during her first year of employment.[1] Carpenter also provided feedback to Stovall. (Doc. 41-2 at 90).

Stovall alleges that Compass Group discriminated and retaliated against her

---

[1] Senior Credit Specialist Kelly Jordan ("Jordan"), Senior Credit Specialist John Knight ("Knight"), Senior Credit Analyst Margie Kohn ("Kohn"), and Credit Specialist Linda Roberts ("Roberts") trained Stovall on the day-to-day functions of a Credit Specialist including how to run reports, how to contact field accounts about outstanding invoices and how to allocate checks. (Doc. 41-2 at 63-64, 89).

2

based on her race and religion.² Stovall is African American and a Jehovah's Witness. (Doc. 8 ¶ 3; Doc. 41-2 at 193). In December 2008, Compass Group announced that the office would close during MSC's holiday party to allow employees to attend. (Doc. 41-2 at 207-209). At some point, Stovall informed Carpenter that she would not be attending the party because she did not celebrate Christmas and asked what she should do during the time that the office was closed. (Id. at 209). After Carpenter spoke with his supervisor Kenny Eiland about the request, he advised Stovall that she could use 0.5 days of vacation time for the period in which the office was closed for the party. (Doc. 41-2 at 219-20).

In early 2009, Carpenter granted Stovall's request to change her work schedule from 8:00 a.m. to 4:30 p.m. to 7:30 a.m. to 4:00 p.m. (Doc. 41-2 at 58-59). Shortly thereafter, however, Stovall repeatedly failed to arrive at work by her newly scheduled start time of 7:30 a.m.³ Based on these tardy arrivals, Carpenter placed Stovall back on her original schedule. (Doc. 41-2 at 59-60).

Stovall alleges that she was treated differently than her co-worker Stephanie

---

² Stovall attached various documents including time cards, notes and computer screen shots that were not accompanied by any sworn testimony as to who created the documents, when they were created, or whether they have been altered in any way. The authenticity of the documents is further undermined by Stovall's admission that she edited the contents of her supposedly contemporaneous notes. See Doc. 43 at 31-32. Stovall relied almost exclusively on these unauthenticated documents as support for her factual allegations and provided virtually no citations to affidavits, deposition transcripts or other discovery materials. The court advises that it cannot consider any of these unauthenticated documents in resolving the motion for summary judgment. See Fed.R.Evid. 801 and 901; Saunders v. Emory Healthcare, Inc., 360 F.App'x. 110, 113 (11th Cir. 2010) ("To be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.").

³ For example, during one week, Stovall arrived late at least three times. (Doc. 41-2 at 59-60, 170-171).

3

Meil ("Meil") who also worked from 7:30 a.m. to 4:00 p.m. (Doc. 43 at 6-16). Although Meil was employed as a Credit Specialist, she worked exclusively in the treasury group opening and closing bank accounts. (41-1 ¶ 9, Exhibit A). During the first month of her employment, Roberts, who performed bank reconciliation duties, and Amanda Bellum trained Meil. Thereafter, Meil worked on her own and asked questions when needed. (Doc. 41-1 ¶ 10; Doc. 401-2 at 88-89).

At the end of Stovall's first year working with Compass Group, she met with Carpenter to discuss her performance appraisal. (Doc. 41-2 at 96-98). In the evaluation, Carpenter rated Stovall as not competent in the areas of productivity, quality of work, knowledge of work, sense of responsibility, relations with others, creativity, reasoning and judgment, self-confidence, adaptability, drive and expression. (Doc. 41-2 at 96-97, Exhibit 17). Stovall agreed with Carpenter's assessment of her performance because "it was clear that [it] was correct." (Doc. 41-2 at 96-98). Neither Stovall's salary nor benefits decreased as a result of the evaluation. (Doc. 41-1 ¶ 6; Doc. 41-2 at 87). Rather, Stovall received a 1.5% merit increase raise on January 1, 2010. Id.

In light of the appraisal, Plaintiff agreed to receive additional job training. (Doc. 41-2 at 96 -98, Exhibit 17). Kohn trained Stovall for several months in various areas with which she demonstrated a lack of understanding, such as behind-the-scenes-billing and proper check allocation. (Doc. 41-2 at 98-101, 112). Stovall met with Carpenter in March 2010 to discuss her specific performance problems – namely, the improper posting of payments and incorrect handling of other

transactions. (Doc. 41-2 at 106-108, Exhibit 18). During the meeting, Stovall agreed that she received adequate training and acknowledged the next steps in the counseling process she would face if she continued to make mistakes. Id.

On July 10, 2010, Stovall sent Carpenter an email stating, "I need to request July 2 off to attend a convention." (Doc. 41-2 at 193, Exhibit 28). Shortly after sending the email, Stovall met with Carpenter in person to discuss the request. (Doc. 41-2 at 194-94). Because it would be difficult to coordinate PTO on that date as it fell during the busy period when Credit Specialist review and distribute interest invoices, Carpenter suggested that Stovall come into work in the morning and attend the convention in the afternoon if everything went well. (Doc. 41-1 ¶¶ 5, 7; Doc. 41-2 at 193-197). Stovall agreed to Carpenter's proposal and did not inform anyone of any issues with the arrangement. (Doc. 41-1 at 197-98). On June 29, 2010, Stovall emailed Carpenter stating he could disregard her request to take off work July 2 because she arranged to attend a different conference instead. (Doc. 41-2 at 199-200, Exhibit 29).

After overhearing Roberts discussing vacation plans for the first week of August, Stovall emailed Carpenter on June 30, 2010, asking,"[i]s there a particular reason why you discriminated against my (sic) and my request for time off last month during Finance Charges and you have approved Linda's request the very next month?" (Doc. 41-2 at 201-202, Exhibit 30). Carpenter explained that he granted Roberts' request because she sent it four months in advance of her proposed vacation days. (Doc. 41-1 ¶ 8; Doc. 41-2 at 202-204).

5

On November 18, 2010, Stovall and Carpenter met to discuss her performance appraisal for 2010. Carpenter rated Stovall less than competent in ten areas including quality of work and knowledge of work. (Doc. 41-2 Exhibit 19). Stovall's overall score for 2010 was 2.08, which was below the threshold rating for competent. (Doc. 41-2 at 117, Exhibit 19). In line with the action plan section of the performance appraisal, Stovall resumed training in the early part of 2011 with Kohn and met with Carpenter at least once a month to discuss her progress. (Doc. 42-2 at 119, 123-24, Exhibit 19).

On March 4, 2011, Carpenter issued Stovall her first formal progressive counseling report regarding errors she continued to make as a Credit Specialist. (Doc. 41-2 at 124-26, Exhibit 20). The report noted that Stovall lacked progress and knowledge in certain areas, such as instances where she admittedly handled payments incorrectly. (Doc. 41-2 at 124-26, Exhibit 20). Stovall agreed with the assessment of her performance and received additional training sessions. (Doc. 41-2 at 124-27).

On May 20, 2011, Carpenter issued Stovall a second progressive counseling for the same reasons as the first. (Doc. 41-2 at 127-129, Exhibit 21). Stovall's performance in the ensuing months did not meet Carpenter's legitimate expectations. (Doc. 41-2 at 138-39). Similarly, Stovall agreed with a final progressive counseling she received in connection with her 2011 performance appraisal,[4] which noted that she continued to make mistakes and had not fully

---

[4] The final progressive counseling detailed several errors Stovall committed over the prior few weeks. See Doc. 41-2 Exhibit 23. Stovall incorrectly posted a payment from Novant

6

grasped the concept of her role. (Doc. 41-2 at 130-32, Exhibit 20). Pursuant to an action plan contained in the 2011 performance appraisal, Stovall resumed training with Kohn and met with Carpenter on December 28, 2011 to discuss ideas to address her development needs. (Doc. 41-2 at 133-34, 145-46, Exhibit 23). Stovall's responsibilities, pay and benefits remained unchanged after receiving each progressive counseling. (Doc. 41-2 at 141, 191).

Stovall alleges that she made the same errors as her co-worker Morgan Sifford ("Sifford"), but was treated differently. (Doc. 43 ¶ 4). Compass Group hired Sifford in September 2010 as a Cash Application Specialist. (Doc. 41-1 ¶ 11). After receiving training from Meil during the first two weeks of her employment, Sifford worked on her own while asking questions when needed. (Doc. 41-1 ¶¶ 11, 12).

Stovall continued to misapply payments and failed to handle accounts receivable appropriately for several locations. (Doc. 41-2 at 154-55, Exhibit 25). Based on her poor performance, Carpenter terminated Stovall's employment in a meeting on April 12, 2012. (Doc. 41-2 at 153-54). The termination report listed a number of recent mistakes made by Stovall. (Doc. 41-2 Exhibit 25). Because Stovall "couldn't argue…that [she] didn't make those mistakes," she signed the termination and counseling paperwork. (Doc. 41-2 at 154-56).

At some point during her employment Stovall confided in her co-worker

---

Health Care and mishandled a refund check resulting in an account being out of balance. Id. Stovall also improperly handled an account at Golden Living Center Northside by posting checks incorrectly. Id. Further, Stovall failed to notify the Regional Director of Operations of an income adjustment at a particular account. Id. These mistakes encompassed topics addressed in Stovall's extensive training, in the informal memo provided to her in 2010 and in the first and second progressive counseling reports issued in 2010 and 2011. (Doc. 41-2 at 132-34, 139-141, Exhibit 23).

Felicia Patterson that she didn't think she was being treated fairly. (Doc. 41-2 at 220). However, Stovall never told anyone at the company that she felt she was being discriminated against based on her race or religion. (Doc. 41-2 at 219).

On April 27, 2012, Stovall filed Charge of Discrimination No. 425-2012-00621 with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 41-2 at 160-61, Exhibit 26). Stovall checked the race, religion and retaliation boxes on the charge and indicated December 1, 2011 as the earliest date that the alleged discrimination took place. (Doc. 41-2 Exhibit 26).

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250 (internal citations omitted).

The basic issue before the court on a motion for summary judgment is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Hinesville Bank v. Pony Exp. Courier Corp., 868 F.2d 1532, 1535 (11th Cir. 1989) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(a), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response ...must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for

trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation and citation omitted).

## LEGAL ANALYSIS

### A. Religious discrimination

Compass Group argues that Stovall's religious discrimination claim is time-barred because she failed to exhaust her administrative remedies. Plaintiffs seeking relief under Title VII must first "exhaust [their] administrative remedies, beginning with the filing of a charge of discrimination with the EEOC" within 180 days of the alleged unlawful employment practice. Jordan v. City of Montgomery, 283 F.App'x. 766, 767 (11th Cir. 2008); See also 42 U.S.C. § 2000e-5(e)(1). "A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Mulhall v. Advance Sec. Inc., 19 F.3d 586, 589 n.8 (11th Cir. 1994). "In other words, judicial claims are allowed if they amplify, clarify or more clearly focus the allegations in the EEOC

10

complaint, while allegations of new acts of discrimination are inappropriate." Russell v. City of Mobile, 2013 WL 1567372, *2 (S.D. Ala. April 12, 2013) (internal quotations omitted).

Stovall filed her EEOC Charge on April 27, 2012. (Doc. 41-2 Exhibit 26). The Charge alleges that after Stovall complained about racial and religious discrimination, she received below average evaluations and write-ups for making accounting errors, which resulted in her termination on April 12, 2012. While a reasonable EEOC investigator may have pursued these allegations of discrimination, all instances of religious discrimination that Stovall went on to allege in her deposition and opposition to summary judgment fall beyond the 180-day threshold of the EEOC Charge. See e.g., Doc. 41-2 at 215-217 (Stovall testified that Compass Group discriminated against her on the basis of her religion when Carpenter required her to use vacation time because she did not attend a company holiday party in December 2008 and when he partially granted her request for time off to attend a religious convention in June 2010). Therefore, Stovall's supposed allegations of religious discrimination alluded to in the EEOC Charge are time-barred, and Compass Group is entitled to summary judgment on these claims as a matter of law.

**B. Racial discrimination**

Title VII prohibits an employer from discriminating against a person based on race or religion. 42 U.S.C. § 2000e-2(a)(1). The plaintiff bears the burden of establishing a prima facie case of discrimination by demonstrating that: (1) she is a

11

member of a protected class (here, African-American); (2) she was qualified for the position she held; (3) she suffered an adverse employment action;[5] and (4) her employer treated her less favorably than similarly situated individuals outside her protected class. Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010); See also Dixon v. Palm Beach County Parks and Recreation Dep't., 343 F.App'x. 500, 502 (11th Cir. 2009). "With respect to this last showing, the individuals must be similarly situated in all relevant respects besides race, since different treatment of dissimilarly situated persons does not violate civil rights laws." Brown v. Berg Spiral Pipe Corp., 2011 WL 3610646, *11 (S.D. Ala. Aug. 17, 2011) (citing Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1274 (11th Cir. 2004) (internal quotations and citations omitted).

Stovall argues that the following individuals were treated more favorably: (1) Meil and Sifford were trained differently; and (2) Sifford, Jordan, Roberts, Knight, and Denise Boggan were disciplined differently.[6] Compass Group contends that

---

[5] To support her race based claims, Stovall contends that Compass Group: (1) issued discipline that was not issued to her white co-workers who made the same errors; (2) trained her differently than her white co-workers; and (3) terminated her employment because of her race. As Compass Group pointed out, with the exception of her termination, these incidents do not constitute an adverse employment action because they did not result in "a serious and material change in the terms, conditions, or privileges of [her] employment." Shepard v. United Parcel Serv., Inc., 470 F.App'x 726, 731 (11th Cir. 2012); See Wallace v. Ga. Dep't of Transp., 212 F.App'x. 799, 801 (11th Cir. 2006) (finding "written reprimand [that] did not lead to any tangible harm in the form of lost pay or benefits" was not an adverse employment action); Melton v. Nat'l Diary LLC, 705 F.Supp. 1303, 1337-38 (M.D. Ala. 2010) (holding no adverse employment action existed where a plaintiff claimed that he "was not trained as other drivers were trained" causing him to experience "a much longer learning curve to establish himself on the job than was usual").

[6] Stovall also argues that Meil was treated more favorably with respect to scheduling. However, this incident cannot be used to support any allegations of discrimination because Stovall failed to exhaust her administrative remedies by filing a charge with the EEOC

12

these individuals are not similarly situated to Stovall and that there is no proof that they were treated more favorably. The court agrees. The positions held and roles fulfilled by the individuals indicated by Stovall differed from Stovall's position and roles.[7] It is also undisputed that none of the other members of the department made the same type of errors as Stovall with the same frequency.[8] Thus, the court finds that summary judgment is due in favor of Compass Group on the racial discrimination claim because Stovall has not demonstrated that similarly situated individuals were treated more favorably.

**C. Retaliation**

To establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was some causal connection between these two events. Dixon, 343 F.App'x. at 503. The protected activity must be the but-for cause of the employer's alleged adverse action. Univ. of Tex. Southwestern Med. Ctr. v.

---

within 180 days of when the incident occurred in 2009. (Doc. 41-2 at 166-61, Exhibit 26).

[7] For example, Sifford worked as a Cash Application Specialist, which entailed different duties and responsibilities than those of Stovall's. Meil and Roberts performed bank reconciliation duties. Knight and Jordan were Senior Credit Specialists.

[8] Stovall argues that she has "proof that [Sifford] made the same errors" that she made and that Meil and Sifford were trained daily because she overheard them talking in Carpenter's office about work. See Doc. 42 ¶ 6; Doc. 41-2 at 188-190. Although Stovall points to deposition evidence to support the contention that she was treated differently, the depositions were not conducted in accordance with Federal Rule of Civil Procedure 30. See Fed.R.Civ.P. 30. Moreover, even if the depositions are admissible, none of these witnesses testified that Stovall was treated differently on the basis of her race. See Doc. 43 at 29-40. Because Stovall failed to point to any evidence on the record to support this vague and conclusory testimony, the court finds that these speculative assertions do not satisfy the similarly situated element of her prima face case. See Smiley v. Colonial Care NH, LLC, 2011 WL 6012175, *5 (M.D. Fla. Nov. 30, 2011) (holding that "[u]nsupported allegations are not evidence and cannot be used" to establish a prima facie case).

13

Nassar, 133 S.Ct. 2517, 2534 (2013). A plaintiff can demonstrate a causal connection by showing a close temporal proximity between the protected activity and the retaliatory conduct. Brown, 2011 WL 3610646, *16.  If the defendant can then articulate a legitimate, non-retaliatory reason for the challenged employment action as an affirmative defense to liability, the burden shifts back to the plaintiff to prove that the reason provided by the employer is pretextual. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1326 (11th Cir. 2011).

Compass Group argues that Stovall cannot establish that she engaged in a statutorily protected activity or that there was a casual connection between such activity and any alleged adverse action. The only two potential instances of protected activity are when Stovall complained about unfair treatment in a conversation with her co-worker Felicia Patterson and in an email to Carpenter in July 2010. However, neither complaint constitutes protected activity because they were not made to Stovall's superior. See Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 715 n.2 (11th Cir. 2002) (holding that Title VII covers informal complaints made to superiors). Moreover, Stovall admits that in each of these instances she did not claim that she was being discriminated against on the basis of her race or religion.[9]

Stovall also fails to demonstrate a causal connection between these activities and any alleged adverse employment action. Stovall received her first progressive

---

[9] Stovall testified that during her conversation with Patterson she "didn't say [that her treatment was based on] race," but merely told Patterson about "things that [she] was dealing with on a day-to-day basis and that [she] didn't think it was fair." (Doc. 41-2 at 220).

14

counseling on March 4, 2011, almost eight months after she emailed Carpenter regarding her PTO request. Stovall was not terminated until April 2012, almost two years after the email was sent. During this time, Stovall admittedly made numerous errors in her work product. Such an extensive lapse in time between the email and Stovall's counseling and termination suggests an absence of causation. Moreover, Stovall received a poor performance appraisal in December 2009 and informal coaching based on her performance in March 2010, before she sent the July 2010 email. This also supports the finding that Stovall's counseling and appraisals are not linked to that email.

Even assuming that Stovall could establish a prima facie case of retaliation, her claim would still fail because Compass Group provided a legitimate, non-retaliatory reason for its actions. Specifically, Compass Group contends that Stovall was terminated because, after four years of employment and extensive training, she continued to make errors and failed to grasp the duties required for her position. Stovall has not rebutted the legitimacy of this reason with any evidence of pretext. See Worley v. City of Lilburn, 408 F.App'x. 248, 251 (11th Cir. 2011) ("Conclusory allegations or unsupported assertions of discrimination, without more, are not sufficient to raise an inference of pretext."). Accordingly, the court finds that summary judgment is due to be granted in favor of Compass Group on the claim of retaliation.

## CONCLUSION

For the reasons stated above, the Court finds that there is no genuine dispute

15

as to any material fact and that Compass Group is entitled to judgment as a matter of law. Accordingly, the defendant Compass Group's motion for summary judgment (Doc. 41) is **GRANTED.**

**DONE** and **ORDERED** this 20th day of June, 2014.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE